# Supreme Court of Florida

_____

No. SC15-348
_____

**STATE OF FLORIDA,**
Petitioner,

vs.

**DONNA HORWITZ,**
Respondent.

[May 5, 2016]

PARIENTE, J.

The issue before the Court is whether, under article I, section 9 of the Florida Constitution and Florida evidentiary law, the State is precluded from using a defendant's pre-arrest, pre-Miranda[1] silence as substantive evidence of guilt when the defendant does not testify at trial. In Horwitz v. State, No. 4D13-336, 2015 WL 671136 (Fla. 4th DCA Feb. 18, 2015), the Fourth District Court of Appeal concluded that the State could not use evidence of this silence as

---

1. Miranda v. Arizona, 384 U.S. 436 (1966).

substantive evidence of guilt and certified the following question to be of great public importance:

> WHETHER, UNDER FLORIDA LAW, THE STATE IS PRECLUDED FROM INTRODUCING EVIDENCE OF A DEFENDANT'S PRE-ARREST, PRE-MIRANDA SILENCE WHERE THE DEFENDANT DOES NOT TESTIFY AT TRIAL?

Id. at *4. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

Donna Horwitz was convicted of first-degree murder with a firearm for the death of her ex-husband, Lanny Horwitz. During the trial, the State repeatedly elicited testimony from law enforcement witnesses that the defendant remained silent following the murder but prior to her formal arrest. The State then emphasized this silence in closing argument by arguing that the jury could consider the defendant's pre-arrest, pre-Miranda silence as evidence of her consciousness of guilt.

The Fourth District, in reversing the conviction, held that under our precedent in State v. Hoggins, 718 So. 2d 761 (Fla. 1998), because the defendant did not testify at trial, the use of the defendant's pre-arrest, pre-Miranda silence was precluded as a matter of state constitutional and evidentiary law. Horwitz, 2015 WL 671136, at *4. We answer the certified question in the affirmative and hold that the use of the defendant's silence as substantive evidence of guilt violates the defendant's right against self-incrimination under the Florida Constitution. And as a matter of Florida evidentiary law, the State is precluded from presenting

- 2 -

evidence of a non-testifying defendant's pre-arrest, pre-Miranda silence and from arguing that silence is evidence of the defendant's consciousness of guilt. On state constitutional grounds, the use of a defendant's silence as substantive evidence of guilt when the defendant does not testify penalizes the defendant's exercise of his or her constitutional privilege against self-incrimination at trial. As a matter of Florida evidentiary law, a defendant's pre-arrest, pre-Miranda silence is generally deemed ambiguous, and any probative value is "substantially outweighed by the danger of unfair prejudice" pursuant to section 90.403, Florida Statutes (2013). We therefore approve the decision of the Fourth District reversing Horwitz's conviction and remanding for a new trial.

## BACKGROUND

Donna Horwitz was charged with first-degree murder with a firearm for the 2011 death of her ex-husband, Lanny Horwitz, in Jupiter, Florida. The Fourth District set forth the facts:

> On the morning of September 30, 2011, Lanny was shot multiple times in the master bathroom of his home and was pronounced dead at the scene.
> [Horwitz] and Lanny had been divorced twice, but they were living together again at the time of the murder. The couple's 38-year-old son, Radley, also lived in Lanny's home.
> Radley was the state's key witness against [Horwitz]. There was evidence that Radley had a troubled relationship with Lanny and that he was a beneficiary on Lanny's life insurance policy . . . .
> Radley testified that in the months before the murder, [Horwitz] complained several times that Lanny was being mean and nasty to her.

[Horwitz] also made comments about the amount of time Lanny spent with a female business associate.

The night before the murder, Lanny went to dinner with Radley and told him that he was planning to travel to North Carolina with the female business associate. Later that night, [Horwitz] mentioned to Radley that she had seen Lanny's luggage in the laundry room and realized that he was leaving town. When Radley went to bed that night, his parents were still awake.

Radley testified that he was awakened the next morning by the sound of gunshots. When he heard the clicking sound of an empty gun, he left his room to see what was happening. He saw [Horwitz] running in and out of his parents' bedroom, screaming his name. The house alarm was triggered by the home's glass break sensors. Radley looked in the bathroom and saw his father on the floor. Radley went back to [Horwitz], who then said, "He was so horrible."

Meanwhile, the security guard at the community gate received an alarm from the Horwitz residence at about 7:00 a.m. He dispatched a security officer, Luis Garcia, to the home. Garcia arrived at the home within about three minutes of receiving the call about the alarm. Radley answered the door, appearing as though he had just gotten out of bed. Garcia asked Radley if everything was okay, and Radley responded, "I don't know, my mom is screaming." Garcia entered the house and saw [Horwitz], who was very upset and was screaming, "I think he's dead."

[Horwitz] pointed to the master bathroom area. Garcia looked in the bathroom and saw Lanny unresponsive on the ground, but still breathing. There was a gun in Lanny's hand, pointed at an angle that led Garcia to believe the wound may have been self-inflicted. Garcia moved the gun away from Lanny's body when he unsuccessfully tried to resuscitate him. [Horwitz] told Garcia, "He said he would do this." However, Radley told Garcia that Lanny and [Horwitz] had been fighting. Garcia escorted [Horwitz] and Radley out of the house. Lanny was declared dead shortly thereafter.

[Horwitz] and Radley waited in Radley's SUV. Radley testified that he noticed several drops of blood on [Horwitz]'s foot. Radley gave [Horwitz] some napkins and she wiped the blood drops off. Radley did not initially mention this to police.

Officer [Kristi] Coleman arrived at the scene in response to a call about a suicide. Coleman made contact with [Horwitz] and Radley, who were sitting in the SUV. At the scene, [Horwitz]

appeared to be in shock. Coleman asked [Horwitz] if she needed anything, but [Horwitz] did not answer. Coleman then asked [Horwitz] if she wanted a bottle of water. In response, [Horwitz] put her fingers in her ears and said she couldn't hear Coleman. Coleman also asked [Horwitz] if she was in the room when the gun went off, but [Horwitz] did not answer. A hearing specialist testified for the defense that [Horwitz] had lost 48% of her ability to hear in each ear.

There was no evidence of forced entry into the home. Authorities found a gun on the floor outside the master bathroom, and another gun in a holster on the bedroom dresser. Bullet fragments fired from both guns were found in the bathroom. Radley tested negative for gun residue.

The gun on the floor near the bathroom had a mixture of Lanny's DNA and one other DNA source. Radley and the security guards were excluded as the second DNA source, but [Horwitz] could not be excluded. About one in fifteen Caucasian individuals (and an even smaller proportion of individuals from other races) would exhibit the same results as [Horwitz]. The gun on the dresser also contained DNA from two people, but the test results were inconclusive as to their identities.

A bloody finger smudge was found on the gate to the home. The blood on the gate contained a mixture of two DNA profiles, one from Lanny and the other from an unidentified source. [Horwitz], Radley, and the security officers were all excluded as the second DNA source on the gate.

A suitcase was found with [Horwitz]'s name on the tag. The suitcase contained ammunition matching the type of ammunition fired from the guns.

The police also located [Horwitz]'s journal, which contained several references to Lanny's relationship with his female business associate. The last entry of the journal was dated September 5th, 2011. It mentioned that Lanny went to see the female associate, and stated in relevant part:

"Another long day of lies, of being Mr. Meany. I stayed home all day. Very tired."

Horwitz, 2015 WL 671136, at *1-2.

Approximately one week after the crime, Horwitz was formally arrested for Lanny's murder. The day after her arrest, she filed a notice invoking her right to remain silent under the Fifth Amendment to the United States Constitution and article I, section 9 of the Florida Constitution. Before trial, Horwitz moved to suppress evidence of her pre-arrest, pre-Miranda silence and to prevent the State from introducing evidence of Horwitz invoking her right to remain silent. The trial court denied the motion.

Based on the trial court's ruling, the State commented on Horwitz's silence at trial, starting with the opening statement: "[Officer Coleman] then says, were you—were you in the room when he got shot? . . . And there was no answer." The State elicited testimony from Officer Coleman and a detective of the Jupiter Police Department relating to Horwitz's failure to respond to questions at the scene immediately after her husband's death. Officer Coleman testified that she initially believed that she was responding to a suicide call, but in further questioning by the State over objection by defense counsel, Officer Coleman testified as follows to her interaction with Horwitz while Horwitz and Radley waited in Radley's SUV:

> Q: And when you first make any contact with her or make any statement, what do you tell her—what do you ask her?
> A: I asked her if she needed anything.
> Q: And what is her response to you?
> A: She didn't answer me.
> Q: And did she actually—did you ask again?
> A: Yes. I asked her if she wanted a bottle of water.
> Q: And what was her response?

- 6 -

A: She put her fingers in her ears and went like this.

Q: And just for the record, you're mouthing. She opened her mouth—

A: Yes.

Q: —on more than one occasion?

A: (Nods head.)

Q: And did she make any statements?

A: No. At that point, I asked her if she was in the room when the gun had gone off. And then I called for fire rescue because she didn't answer me.

 . . . .

Q: What was her demeanor like when you made contact with her?

A: She seemed to appear to be in shock.

Q: Okay. Now you stated that she put, when you asked her if she was all right, or asked her if she wanted a bottle of water, that she put her hands—her fingers on her ears?

A: Yes.

Q: And was mouthing something?

A: Yes.

Q: Did she at any point tell—ask you—say to you that she couldn't hear you?

A: Yes. She said she couldn't hear me.

Q: And was that, basically, around the same time that she was—had her fingers to her ears?

A: Yes.

Q: And after—after she responded in that manner, did you then ask her if she—did you then ask her another question?

A: Yes.

Q: And what was that question?

A: I asked her if she was in the room when the gun went off.

Q: And when you said this, were you looking directly at her?

A: Yes.

Q: And did she appear to be looking at you?

A: Yes.

Q: Did she respond in any way when you asked her if she was in the room when the gun went off?

A: No.

Q: Do you continue to look at her and wait for a response?

A: Yes.

> Q: <u>Did she respond—respond in any way to that question?</u>
> A: <u>No.</u>

(Emphasis added.)

Later in the trial, the State called Detective Eric Frank, the lead detective on the case. He testified that he arrived on the scene shortly after Officer Coleman and the other initial police officers had arrived, when Horwitz was still sitting inside the SUV. Upon arriving at the scene, Detective Frank performed a walkthrough of the house, upon which "it definitely raised concern that there was something more" than a suicide. According to Detective Frank, based on his observation of the physical evidence, law enforcement decided to obtain a search warrant for the residence for "firearms, ammunition, blood, clothing, anything that could relate to the scene as [they] initially saw it."

During redirect examination of Detective Frank, the State asked questions that implicated Horwitz's privilege against self-incrimination:

> Q: . . . You asked Radley more than once, did your mom say what happened? Do you remember that?
> A: Yes, I do.
> Q: And, in fact, he was never able to relate to you anything [Horwitz] said, was he?
> A: No.
> Q: And, in fact, as the lead detective, any statements at all about—from [Horwitz] to Luis Garcia that a fourth or fifth person had been in the house?
> A: No.
> Q: Any statement by [Horwitz] to Radley that a fourth or fifth person was in the house?
> A: No.

- 8 -

Q: Any statement by [Horwitz] to anyone, anyone—

Defense counsel objected on the ground that the State was commenting on Horwitz's right to remain silent and moved for a mistrial. At sidebar, the trial court acknowledged that the law related to the admissibility of pre-arrest, pre-Miranda silence was unsettled and recognized that Horwitz was preserving the issue, but overruled the objection.

The State then elicited additional testimony from Detective Frank related to Horwitz's pre-arrest, pre-Miranda silence:

> Q: So Detective Frank, Donna Horwitz never told Luis Garcia about anyone else being in the house, did she?
> A: No, she did not.
> Q: She never told Kristi Coleman about anyone else being in the house?
> A: No.
> Q: Or Officer Mayernik?
> A: No.
> Q: Or David Cockrum?
> A: No.
> Q: And Donna Horwitz never said anything about what took place in the house, to any of those people, did she?
> A: No, she did not.

The defense's theory was that Radley Horwitz or someone hired by Radley committed the murder. To support this theory, defense counsel elicited testimony from Mary Jane Garbo, the mother of Radley's daughter, about a phone call between her and Radley that morning, not long after the murder. Garbo testified that Radley's demeanor was nonchalant and that he seemed calm and collected.

The defense also attacked the credibility of Radley, who testified at trial, and suggested that Radley had a motive to commit the murder or hire someone to do so and to subsequently cooperate with the State.

During closing argument, the State relied on the testimony of Officer Coleman and Detective Frank, arguing: "When the police officers first get there; these are armed, uniformed people there to help her. And she says nothing." Defense counsel objected and moved for a mistrial, arguing that this was a comment on Horwitz's right to remain silent. After the trial court overruled the objection, the prosecutor repeatedly emphasized Horwitz's pre-arrest, pre-Miranda silence and reminded the jury that defense counsel suggested that someone else could have broken into the house and committed the murder:

> You know from all the officers, they thought this was a suicide call. They're over there trying to console [Horwitz]. And she says nothing to them.
>  . . . .
> The Defendant, at that time, had no right to silent [sic].
> You can take that as evidence of consciousness of guilt, when she does not speak to Luis Garcia or Kristi Coleman or to Radley. There is no right to remain silent at that time. You can take that as evidence of consciousness of guilt.
>  . . . .
> And you heard from David Cockrum; he's also with Admirals [Cove]. He went in with Garcia to that same area of the victim. He also went through the gate and out through the gate. [Horwitz] said nothing to David Cockrum.
>  . . . .
> Officer Mayernik, from Jupiter Police Department, he was— when he gets there, there's two security guys there. That would be

Luis and David Cockrum.  Garcia briefed him.  <u>Mayernik, when he goes in; [Horwitz] said nothing to him.</u>

. . . .

EMT Bryan Dittmer comes in, pronounces him dead.  And [Horwitz] says nothing to Bryan Dittmer.

. . . .

Chris Fisher arrives a few minutes after Garcia. . . .  And [Horwitz] said nothing to him.

And keep in mind, again, we talk about people's words and actions before, during and after.  So up to this point, [Horwitz] has said nothing but, he was so awful.  He was so awful.  And he was— said he was going to do this.

Not, oh my God, I don't know what happened.

Not, oh my God.  I was dead asleep and there was a man at the foot of the bed.

Not, oh my God.  The alarm went off and there was a man looking through my bedroom drawers for a gun.  Not any of that.

No hit man.  No third person.  Not any such thing.  And it's in her bedroom.  <u>So far she had said nothing to any of these initial officers or EMT.</u>

Kristi Coleman, you heard from.  Eighteen years she's been a police officer.

She thinks it's a suicide call.  She goes over there to comfort the family and calls the chaplain.

She says her first words to [Horwitz] are, are you okay?

And [Horwitz], did like that, (indicating).  And prompted Kristi to say, were you—were you in the room when the gun went off?  <u>And [Horwitz] did not answer.</u>

(Emphasis added.)

Defense counsel objected again on the same basis, but the trial court overruled the objection.  During the State's rebuttal closing argument, the prosecutor continued to comment on Horwitz's silence:

And then Officer Coleman is concerned.  And she says, were you in the room when he was shot, when the gun went off?  <u>Nothing. That's what she says, absolutely nothing.  And you can consider that.</u>

- 11 -

> The fact that when someone asks her if she's in the room when she shot—when they think it's suicide, she's [sic] says nothing.
>
> . . . .
>
> When Mr. Garcia and Miss Coleman ask her questions, she does not take the blame for her son. She does not say that Lanny [sic] Horwitz did it. Instead, she says nothing. This isn't a situation where she took the blame for her son.

(Emphasis added).

At the conclusion of the trial, Horwitz was found guilty of first-degree murder with a firearm. On appeal, Horwitz argued that the trial court erred in permitting the State to adduce evidence about and comment extensively on her pre-arrest, pre-Miranda silence.

The Fourth District reversed Horwitz's conviction on the ground that the trial court committed harmful error in admitting evidence of Horwitz's pre-arrest, pre-Miranda silence. Horwitz, 2015 WL 671136, at *1 n.1, *4. While acknowledging that a plurality of the United States Supreme Court in Salinas v. Texas, 133 S. Ct. 2174 (2013), required a defendant to expressly invoke the privilege against self-incrimination in order for the Fifth Amendment to bar comment on pre-arrest, pre-Miranda silence, the Fourth District recognized that Florida may interpret its privilege against self-incrimination to afford greater protection than its federal counterpart. Horwitz, 2015 WL 671136, at *3. The Fourth District relied on this Court's decision in Hoggins, 718 So. 2d at 770-71, 770 n.11, in concluding that Horwitz's pre-arrest, pre-Miranda silence was

- 12 -

inadmissible under Florida law because she did not testify. Judge Klingensmith dissented, asserting that Salinas should serve as controlling precedent because it was decided after this Court's decision in Hoggins. Horwitz, 2015 WL 671136, at *4 (Klingensmith, J., dissenting). The Fourth District certified as a question of great public importance whether, under Florida law, the State may introduce a non-testifying defendant's pre-arrest, pre-Miranda silence. Id. at *4.

## ANALYSIS

The issue before the Court is whether, under article I, section 9 of the Florida Constitution and Florida evidentiary law, the State is precluded from using a defendant's pre-arrest, pre-Miranda silence as substantive evidence of guilt when the defendant does not testify at trial. The State asserts that a defendant's silence occurring prior to his or her arrest is admissible because the privilege against self-incrimination does not apply outside of the context of arrest or custodial interrogation, unless the defendant has expressly invoked the privilege against self-incrimination. Further, the State argues that pre-arrest, pre-Miranda silence should not be "categorically barred under evidentiary rules as its probative value is not always substantially outweighed by its prejudicial effect." Horwitz counters that the Florida Constitution is more protective of the privilege against self-incrimination than its federal counterpart, and that, under this Court's precedent,

pre-arrest, pre-<u>Miranda</u> silence is admissible only if it is inconsistent with the defendant's trial testimony.

In addressing the contours of the restrictions on the State's use of a defendant's pre-arrest, pre-<u>Miranda</u> silence, we begin with the Florida Constitution's more protective privilege against self-incrimination as compared to its federal counterpart. We then analyze the issue under Florida evidentiary law, addressing the issues of relevancy and whether any probative value is substantially outweighed by the danger of unfair prejudice.

## I. FLORIDA'S CONSTITUTIONAL PRIVILEGE AGAINST SELF-INCRIMINATION

Because the Fourth District's decision construes a constitutional provision, we review this pure question of law de novo. <u>Henry v. State</u>, 175 So. 3d 675, 676-77 (Fla. 2015). The pertinent provision of the Florida Constitution provides that "No person shall . . . be compelled in any criminal matter to be a witness against oneself." Art. I, § 9, Fla. Const.[2] This constitutional right has been referred to interchangeably as the "right to remain silent" and the "privilege against self-incrimination."

---

2. The Fifth Amendment states, in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

- 14 -

Florida's privilege against self-incrimination is fundamental; it is part of the Florida Constitution's Declaration of Rights, "a series of rights so basic that the framers of our Constitution accorded them a place of special privilege." Traylor v. State, 596 So. 2d 957, 963 (Fla. 1992); art. I, Fla. Const. As this Court explained in Traylor:

> Special vigilance is required where the fundamental rights of Florida citizens suspected of wrongdoing are concerned, for here society has a strong natural inclination to relinquish incrementally the hard-won and stoutly defended freedoms enumerated in our Declaration in its effort to preserve public order. Each law-abiding member of society is inclined to strike out at crime reflexively by constricting the constitutional rights of all citizens in order to limit those of the suspect—each is inclined to give up a degree of his or her own protection from government intrusion in order to permit greater intrusion into the life of the suspect. The framers of our Constitution, however, deliberately rejected the short-term solution in favor of a fairer, more structured system of criminal justice:
>
>> These rights [enumerated in the Declaration of Rights] curtail and restrain the power of the State. It is more important to preserve them, even though at times a guilty man may go free, than it is to obtain a conviction by ignoring or violating them. The end does not justify the means. Might is not always right. Under our system of constitutional government, the State should not set the example of violating fundamental rights guaranteed by the Constitution to all citizens in order to obtain a conviction.
>
> Bizzell v. State, 71 So. 2d 735, 738 (Fla. 1954). Thus, even here—especially here—where the rights of those suspected of wrongdoing are concerned, the framers drew a bright line and said to government, "Thus far shalt thou come, but no farther."

596 So. 2d at 963-64.

- 15 -

Unless the Florida Constitution specifies otherwise,[3] this Court, as the ultimate arbiter of the meaning and extent of the safeguards and fundamental rights provided by the Florida Constitution, may interpret those rights as providing greater protections than those in the United States Constitution. State v. Kelly, 999 So. 2d 1029, 1042 (Fla. 2008). Put simply, the United States Constitution generally sets the "floor"—not the "ceiling"—of personal rights and freedoms that must be afforded to a defendant by Florida law. Id. As we explained in Kelly, "we have the duty to independently examine and determine questions of state law so long as we do not run afoul of federal constitutional protections or the provisions of the Florida Constitution that require us to apply federal law in state-law contexts." 999 So. 2d at 1043 (emphasis in original). Our Court reemphasized what we previously stated in Traylor: "[w]hen called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein." Id. at 1044 (quoting Traylor, 596 So. 2d at 962-63).

---

3. The Florida Constitution expressly provides that the right against unreasonable searches and seizures, article I, section 12, Florida Constitution, and the right against cruel or unusual punishment, article I, section 17, Florida Constitution, must be read in conformity with federal law.

As this Court held in Traylor, the privilege against self-incrimination, as one of our Constitution's fundamental rights, must be—and has long been—broadly construed. 596 So. 2d at 965 (citing Ex parte Senior, 19 So. 652, 654 (Fla. 1896)). Indeed, as this Court has since reemphasized, the privilege against self-incrimination provided in the Florida Constitution offers more protection than the right provided in the Fifth Amendment to the United States Constitution. Rigterink v. State, 66 So. 3d 866, 888 (Fla. 2011).

This Court's interpretation of the state constitutional privilege against self-incrimination as providing more protection than its federal counterpart was applied to a defendant's post-arrest, pre-Miranda silence in Hoggins, 718 So. 2d 761. In that case, we held that the State's use of this post-arrest, pre-Miranda silence to impeach the defendant's trial testimony violated Florida's constitutional privilege against self-incrimination, even though such impeachment evidence is not barred by the Fifth Amendment. Id. at 765, 769-72. In other words, we interpreted the Florida constitutional right as providing more "rigorous constraints on the use of" a defendant's post-arrest, pre-Miranda silence than what is permissible under the Federal Constitution. Id. at 768. In Hoggins, we expressly departed from the United States Supreme Court's decision in Fletcher v. Weir, 455 U.S. 603, 606 (1982), which held that the federal constitution did not preclude states from using a defendant's post-arrest, pre-Miranda silence for impeachment purposes. Id. at 769.

- 17 -

In Hoggins, after an armed robbery of a convenience store, the perpetrator "absconded with the cash register drawer and a cigar box containing lottery tickets." Id. at 762. The defendant was spotted riding a bicycle while carrying the missing items. Id. The defendant testified at trial, claiming that his bicycle had been stolen and that he had witnessed someone run into his apartment complex and hide something, which he later discovered was the drawer and cigar box. Id. at 763. The prosecutor cross-examined the defendant, asking whether the defendant had previously provided that explanation after his arrest, and the defendant admitted that he had not. Id. The prosecutor also relied on this "silence" in closing arguments, pointing out that the defendant did not tell the same version of events to the police on the night of his arrest that he provided in his testimony at trial. Id. at 764.

We reached a different conclusion in Hoggins than the Supreme Court on the issue of post-arrest, pre-Miranda silence for two reasons: (1) "unlike the United States Supreme Court, Florida courts have recognized that the defendant does not waive his or her right to silence at the time of arrest by taking the stand in his or her own defense," and (2) "[w]hile the absence of Miranda warnings may prevent a federal due process violation from occurring where the defendant's post-arrest silence is used for impeachment purposes, the same is not true of the defendant's right to remain silent. The absence of such warnings does not add to or detract

from an individual's right to remain silent." Id. at 769-70.  In Hoggins, we recognized that the privilege against self-incrimination must be scrupulously protected, regardless of whether Miranda warnings were given:

> If one has a right upon arrest not to speak for fear of self-incrimination, then the mere fact the police call his attention to that right does not elevate it to any higher level.  If it were otherwise, an ignorant defendant who was advised of his right to remain silent would be protected against use of his silence to impeach him at trial; but an educated, sophisticated defendant familiar with his right to remain silent who was not apprised of that right by the police would be subject to impeachment for the exercise of a known constitutionally protected right.

> [Webb v. State, 347 So. 2d 1054, 1056 (Fla. 4th DCA 1977).]  Thus, by relying on the right to remain silent to preclude evidence of and comment upon postarrest silence we avoid treating differently defendants who are aware of their Miranda rights and those who are not.  Moreover, we do not provide police officers with an incentive to delay the giving of Miranda warnings.

Id. at 770.

Although in Hoggins, this Court concluded that "the use of a defendant's silence at the time of arrest violates article I, section 9 of Florida's Constitution regardless of whether Miranda warnings have been given," the Court also reasoned that its holding did not extend to impeachment of the defendant with pre-arrest, pre-Miranda silence.  Id.  We further stated that a testifying defendant may be impeached with pre-arrest, pre-Miranda silence "only if the silence was inconsistent with the defendant's testimony at trial."  Id. at 770 & n.11 (emphasis

added).  While the State argues that the statement in <u>Hoggins</u> was dicta, it logically follows that if this Court required inconsistency before silence could be used to impeach the defendant in <u>Hoggins</u>, this Court would not condone a more substantial incursion on the privilege against self-incrimination by allowing a defendant's pre-arrest, pre-<u>Miranda</u> silence to be used as substantive evidence of guilt.

In addition to arguing that our statement in <u>Hoggins</u> regarding pre-arrest, pre-<u>Miranda</u> silence was dicta, the State specifically urges us to follow the United States Supreme Court's decision in <u>Salinas</u>, 133 S. Ct. 2174.  In <u>Salinas</u>, the Supreme Court addressed the issue of whether pre-arrest silence may be used as substantive evidence of a defendant's guilt.  The plurality in <u>Salinas</u> concluded that, prior to arrest and outside the context of custodial interrogation, silence alone is not enough to invoke the protections of the Fifth Amendment; rather, an express invocation is necessary.  133 S. Ct. at 2183-84.  Thus, the Government's use of the defendant's pre-arrest, pre-<u>Miranda</u> silence was permissible because the defendant had not expressly invoked the privilege against self-incrimination.  <u>Id.</u> at 2184.[4]

---

4. Although we decide the present case on Florida law, we note that <u>Salinas</u> was a fragmented decision: the plurality was comprised of Justices Alito and Kennedy, and Chief Justice Roberts.  Justices Thomas and Scalia concurred in the judgment, and four justices—Breyer, Ginsburg, Sotomayor, and Kagen— dissented.  <u>See</u> <u>Salinas</u>, 133 S. Ct. at 2184 (Thomas, J., concurring in judgment), 2185 (Breyer, J., dissenting).  The precedential value of a fragmented decision,

In Salinas, the defendant was convicted of two counts of murder, and the "silence" in question occurred during a police interview at the police station before the defendant was arrested. Id. at 2178. Although he had answered other questions during the police interview, when asked whether his shotgun would match the shells recovered at the scene of a murder, the defendant looked at the floor, shuffled his feet, bit his bottom lip and clenched his hands in his lap. Id. The defendant did not testify at trial, but the prosecutor stated to the jury, among other things, that "[a]n innocent person" would have said, "What are you talking about? I didn't do that. I wasn't there." Id. at 2185 (Breyer, J. dissenting).

The plurality explained that there are two exceptions to the requirement that witnesses invoke the privilege against self-incrimination: (1) the right not to testify at the criminal defendant's own trial; and (2) when governmental coercion is present, making the forfeiture of the privilege involuntary. Id. at 2179-80. However, neither applied in Salinas. Id. The plurality refused to adopt a third exception for cases in which a witness stands mute and thereby declines to give an answer that officials suspect would be incriminating. Id. at 2180-81.

Justice Breyer, in dissent, and joined by Justices Ginsburg, Sotomayor, and Kagan, explained that the prosecutor's ability to use a defendant's silence against

where no single rationale enjoys the assent of five justices, is based upon the "narrowest grounds." See Marks v. United States, 430 U.S. 188, 193 (1977).

him as evidence of guilt places the defendant in an "impossible predicament": either to answer the question or to remain silent. Id. at 2186 (Breyer, J., dissenting). Given the circumstances where a defendant stands mute during questioning, the dissent explained, the defendant invokes his privilege against self-incrimination if the surrounding circumstances raise a reasonable inference that the defendant is intending to do so. Id. at 2189.

We decline to apply the reasoning of the plurality in Salinas to whether a non-testifying defendant's privilege against self-incrimination under the Florida Constitution is violated by the State's use of his or her pre-arrest, pre-Miranda silence as substantive evidence of the defendant's guilt. In Hoggins, we concluded that a defendant's pre-arrest, pre-Miranda silence is admissible only to impeach the defendant's inconsistent trial testimony. 718 So. 2d at 770 n.11. Use of the defendant's silence as substantive evidence of the defendant's guilt is certainly more harmful than its use to impeach the defendant's credibility on the stand.

On the other hand, to allow the State to introduce evidence of and comment on a defendant's pre-arrest, pre-Miranda silence burdens the defendant's privilege against self-incrimination at trial. Particularly, when a defendant exercises the privilege against self-incrimination at trial by not taking the stand, the defendant may be doing so, in part, to prevent the State from having the opportunity for impeachment. Allowing the defendant's previous silence to be used as substantive

evidence of consciousness of guilt would penalize the defendant for exercising that right at trial. The defendant should not be compelled to make the choice between testifying—with the possibility that his or her earlier silence might be used to impeach him or her—and not testifying—thereby, under the State's view, allowing the State to use the defendant's earlier silence as substantive evidence of the defendant's guilt. Our analysis is entirely consistent and directly flows from our decision in Hoggins, as well as our consistent commitment to providing greater protection to a defendant's privilege against self-incrimination guaranteed by the Florida Constitution.

Our reasoning is also consistent with that of the Pennsylvania Supreme Court in Commonwealth v. Molina, 104 A.3d 430 (Pa. 2014). In Molina, the murder victim was missing for six months, and early into the investigation of her disappearance, a detective communicated with the defendant over the telephone. Id. at 433. However, when the detective asked the defendant to meet in person, he refused. Id. At trial, the prosecutor was allowed to argue in closing argument that the defendant "refuse[d] to cooperate with the Missing Persons detectives." Id. at 433-34.

The Pennsylvania Supreme Court held that the use of the defendant's pre-arrest silence as substantive evidence of guilt burdened the right against self-incrimination. It reasoned that the timing of the silence "is not relevant to the

question of whether a prosecutor's use of the silence as substantive evidence of guilt violates an individual's right against self-incrimination." Id. at 449-50. The court explained that the "underpinnings of the right against self-incrimination are not based on timing but on whether a person has been compelled to be a witness against himself at a criminal proceeding." Id. (emphasis added). A forced confession is violative of the Fifth Amendment and therefore inadmissible at trial because "it would result in the defendant being 'compelled to give evidence against himself.'" Id. (quoting Pa. Const. art. 1 § 9).

The Molina court explained that the right is "burdened" by allowing the State to use the defendant's pre-arrest silence as substantive evidence of the defendant's guilt during the trial. Id. Embracing the cogent reasoning of its former Justice Musmanno, the Court delineated the "conundrum" in which a defendant is placed: "If [a defendant] could not be made a self-accusing witness by coerced answers, he should not be made a witness against himself by unspoken assumed answers." Id. (citing Com. v. Dravecz, 227 A.2d 904, 907 (Pa. 1967)).

For all these reasons, we conclude that a defendant's privilege against self-incrimination guaranteed under article I, section 9 of the Florida Constitution is violated when his or her pre-arrest, pre-Miranda silence is used against the defendant at trial as substantive evidence of the defendant's consciousness of guilt. Intertwined with these constitutional grounds is the evidentiary reason why the

- 24 -

introduction of the defendant's pre-arrest, pre-<u>Miranda</u> silence as evidence of guilt is impermissible.

## II. EVIDENTIARY BASIS FOR EXCLUSION

Even if the Florida Constitution did not preclude the use of a non-testifying defendant's pre-arrest, pre-<u>Miranda</u> silence as substantive evidence of guilt, its use would be precluded under Florida evidentiary law. We observed in <u>Hoggins</u> that "[u]nder federal evidentiary law, pre-<u>Miranda</u> silence must be inconsistent with defendant's exculpatory statement at trial before it can be admitted to impeach the defendant." 718 So. 2d at 766 (citing <u>Jenkins v. Anderson</u>, 447 U.S. 231, 239 (1980)). "If no inconsistency exists, then the silence lacks probative value and is inadmissible." <u>Id.</u> As the United States Supreme Court has stated, each state is "free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial." <u>Jenkins</u>, 447 U.S. at 240.

Under Florida's rules of evidence, any type of evidence must meet a threshold of relevance. <u>See</u> <u>Chandler v. State</u>, 534 So. 2d 701, 703 (Fla. 1988). Relevant evidence is defined as "evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2013). Relevancy has been described as "whether the evidence has any logical tendency to prove or disprove a fact. If the evidence is logically probative, it is relevant and admissible unless there is a reason for not

allowing the jury to consider it." Charles W. Ehrhardt, <u>Ehrhardt's Florida Evidence</u> § 401.1 (2011 ed.).

In <u>Hoggins</u>, we stated that "Florida's rules of evidence would preclude . . . use" of the defendant's pre-arrest silence if it "was not inconsistent with his [or her] trial testimony." 718 So. 2d at 770. Such limit on the use of silence exists because "[s]ilence is generally deemed ambiguous." <u>Id.</u> at 771. We explained in <u>Hoggins</u> that "[t]he time of arrest is not an occasion when circumstances naturally call upon a defendant to speak out. On the contrary, there are many reasons that a defendant may choose to remain silent." <u>Id.</u> This Court cited to the reasoning of the United States Supreme Court in <u>United States v. Hale</u>, 422 U.S. 171 (1975):

> At the time of arrest . . . innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.

<u>Hoggins</u>, 718 So. 2d at 771 (quoting <u>Hale</u>, 422 U.S. at 177).

A defendant's silence prior to the time of formal arrest is also ambiguous. For example, before arrest, an individual is just as susceptible to being in fear that his or her story will not be believed, not hearing or understanding the question,

having the desire to protect another, being introverted, being in shock, or having prior knowledge of his or her <u>Miranda</u> rights.

A defendant, who is being questioned by the police but not yet under arrest, may be intimidated by the police questioning or may be in an emotional state, such as shock or confusion, especially if the questioning occurs in close proximity to the crime. If the silence is in response to a question, the defendant may not have heard the question, but if there was no question asked at all, a person's silence is even more ambiguous. There are simply too many possible explanations for why the defendant may not make a statement or respond to a question apart from having a consciousness of guilt. In other words, a non-testifying defendant's pre-arrest, pre-<u>Miranda</u> silence will often have little evidentiary probative value or relevance.

On the other side of the equation is the danger that any possible probative value will be outweighed by unfair prejudice. Evidence is "inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2011). The ambiguity of silence, when used as substantive evidence of guilt, is especially prejudicial. A jury that is allowed to consider a defendant's ambiguous silence as evidence of guilt could conclude that the defendant's failure to explain the silence—which of course the defendant is not obligated to do—supports an inappropriate belief that the defendant is guilty.

- 27 -

Indeed, by allowing the State to argue silence as evidence of guilt implicitly and inappropriately shifts the burden to the defendant to provide an explanation.

Part of the potential for unfair prejudice arises by the fact that the silence at issue—pre-arrest, pre-Miranda silence—is usually introduced through a witness who is a State actor. As we have explained in the past, "[w]hen a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave." Martinez v. State, 761 So. 2d 1074, 1080 (Fla. 2000) (quoting Rodriguez v. State, 609 So. 2d 493, 500 (Fla. 1992)). Florida courts have recognized that "[t]here is the danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial." Charles v. State, 79 So. 3d 233, 235 (Fla. 4th DCA 2012).

This combination of a lack of probative value and the danger of unfair prejudice is particularly evident when a defendant does not testify at trial and does not provide an explanation for the silence so that the jury is left to speculate. As the United States Supreme Court stated in Hale, "[i]f the Government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded." 422 U.S. at 176.

Because of its lack of probative value, coupled with the danger of unfair prejudice under Florida evidentiary law, the State may not introduce a defendant's pre-arrest, pre-Miranda silence as substantive evidence of the defendant's consciousness of guilt.[5]

## III.  THIS CASE

In this case, through its questioning of police officers and in closing argument, the State repeatedly emphasized Horwitz's silence and repeatedly argued that her silence was "evidence of consciousness of guilt."  This use of Horwitz's silence violated her state constitutional privilege against self-incrimination.  It penalized her right not to testify at trial and forced Horwitz to offer evidence, short of her own testimony, as to why she remained silent.  Clearly there were possible explanations for Horwitz's silence other than guilt, including her being in shock and unable to hear.  Silence can "mean" anything, and a defendant "should not be made a witness against himself by unspoken assumed answers."  Molina, 104 A.3d at 450 (internal citation omitted).

In this case, the use of pre-arrest silence as consciousness of guilt was even more harmful because the defendant has never provided an account of the crime

_____

5. Although the certified question we address in this opinion specifically relates to a defendant who does not testify at trial, it logically follows from Hoggins that where the defendant does take the stand, the pre-arrest, pre-Miranda silence is also not admissible as substantive evidence of guilt.

- 29 -

herself or offered an exculpatory statement to law enforcement or the State. Horwitz consistently remained silent, beginning with her initial interactions with law enforcement officers following the murder and leading up to and including her decision not to testify at trial.[6] These circumstances are strong evidence that Horwitz's silence arose from either shock over her ex-husband's death or from her desire to invoke her privilege against self-incrimination. Based on constitutional as well as evidentiary grounds, it was error for the trial court to allow the State to introduce this evidence and allow the State to argue that the silence showed Horwitz's consciousness of guilt.

Finally, we reject the State's argument that Horwitz's silence was probative in rebutting Horwitz's theory that Radley or someone else committed the murder, which included testimony about Radley's demeanor and tone of voice on a telephone call right after the murder with the mother of his daughter. That testimony was limited to Radley's demeanor and tone of voice. The introduction of Horwitz's failure to make specific statements as evidence of her consciousness

_____

6. We specifically address Horwitz's silence in her interactions with State actors, specifically Officer Coleman, Officer Mayernik and Detective Frank. See State v. Jones, 461 So. 2d 97, 99 (Fla. 1984). In addition to the State improperly eliciting the testimony about Horwitz's silence from Detective Frank because he is a State actor, upon review of the record, his testimony also appears to be problematic because he lacks the requisite personal knowledge to testify regarding Horwitz's silence in the presence of some of the witnesses. See § 90.604, Fla. Stat. (2011).

of guilt is not proper rebuttal to evidence of <u>Radley's</u> demeanor. Additionally, the testimony regarding Radley's demeanor on the phone call was elicited during the defense's presentation of witnesses, well after the State had already introduced evidence of Horwitz's silence. Horwitz's silence also is not proper rebuttal evidence of the defense's theory that Radley or someone else committed the murder because Horwitz did not testify at trial and never made any statements that would allow the introduction of her pre-arrest, pre-<u>Miranda</u> silence.

Horwitz's silence was heavily relied upon by the prosecutor in this case as substantive evidence of Horwitz's consciousness of guilt. The prosecutor questioned two law enforcement witnesses regarding Horwitz's silence and referred to it extensively in closing argument. As this Court has established in prior cases, a defendant has a right to stand mute at trial, and anything "fairly susceptible of being interpreted by the jury as a comment on [defendant's] failure to testify" is "a serious error." <u>See</u> <u>State v. Kinchen</u>, 490 So. 2d 21, 22 (Fla. 1985). There is no question in this case that the State directly commented on Horwitz's silence and used it as substantive evidence of guilt. Consistent with the Fourth District's decision below, we agree that the error was not harmless beyond a reasonable doubt. <u>Horwitz</u>, 2015 WL 671136, at *4; <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1135 (Fla. 1986).

**CONCLUSION**

We hold that the State's use of a defendant's pre-arrest, pre-<u>Miranda</u> silence as substantive evidence of guilt violates the Florida constitutional right against self-incrimination, and the State is further precluded under Florida's evidentiary law from using that silence to argue a defendant's consciousness of guilt. We approve the Fourth District's decision and remand for proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
CANADY and POLSTON, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance

Fourth District - Case No. 4D13-336

(Palm Beach County)

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Consiglia Terenzio, Bureau Chief, and Luke Robert Napodano, Assistant Attorney General, West Palm Beach, Florida,

for Petitioner

Jonathan Thomas Mann of the Law Offices of Robin Bresky, Boca Raton, Florida; and W. Grey Tesh, West Palm Beach, Florida,

for Respondent