# Supreme Court of Florida

————————

No. SC15-1486

————————

**SHARON MYERS,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[February 23, 2017]

PARIENTE, J.

The issue before the Court is whether the Fifth District Court of Appeal misapplied our precedent from Ross v. State, 45 So. 3d 403 (Fla. 2010), and Ramirez v. State, 739 So. 2d 568 (Fla. 1999), when it reversed the trial court's determination that the defendant, Sharon Myers, was in custody for the purpose of administering Miranda[1] warnings based on the totality of the circumstances. State

———————————————————

1. Miranda v. Arizona, 384 U.S. 436 (1966).

v. Myers, 169 So. 3d 1227, 1230 (Fla. 5th DCA 2015).  We have jurisdiction.  See art. V, § 3(b)(3), Fla. Const.[2]

At the heart of this issue is the constitutional right against self-incrimination under the Fifth Amendment to the United States Constitution and article I, section 9, of the Florida Constitution.  Specifically, we review the constitutionally required "procedural safeguards" first set forth by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436 (1966), that "assure that [a criminal defendant] is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself."  Id. at 444, 439.  As this Court recently stated in State v. Horwitz, 191 So. 3d 429 (Fla. 2016), in Florida, the right "against self-incrimination, as one of our Constitution's fundamental rights, must be—and has long been—broadly construed."  Id. at 439 (citing Traylor v. State, 596 So. 2d 957, 965 (Fla. 1992)).

In this case, police interrogated Myers on two occasions—both times at the police station—first within hours and then just days after her husband was murdered and after her son and his friend had already confessed to the murder and implicated Myers in planning and facilitating the murder.  The entire tenor of the

---

2.  See Dorsey v. Reider, 139 So. 3d 860, 862 n.1 (Fla. 2014); Van v. Schmidt, 122 So. 3d 243, 246 (Fla. 2013) (citing State v. McMahon, 94 So. 3d 468, 471 n.2 (Fla. 2012)).

interrogations, which were conducted by a team of multiple officers, was accusatorial, aggressive, and confrontational. As the trial court found, during both interrogations, Myers was "immediately and aggressively confronted by multiple officers about her involvement in the murder. The tone of their questioning indicated that law enforcement believed [Myers] was a suspect."

For the reasons more fully explained below, we conclude that Myers was in custody for purposes of Miranda warnings during both interrogations, and the Fifth District did not afford proper deference to the trial court's findings, nor did it adequately consider the factors this Court set forth in Ramirez and explained in Ross guiding police on when Miranda warnings are necessary. We agree with the trial court and with Judge Cohen's dissent in the Fifth District's decision that "a reasonable person would have felt constrained" in the circumstances in which Myers was interrogated. Myers, 169 So. 3d at 1232 (Cohen, J., dissenting). As Judge Cohen explained, "courts should view attempts by law enforcement to circumvent [Miranda] safeguards warily." Id. Thus, Myers' constitutional right against self-incrimination under both the United States Constitution and the Florida Constitution was violated by the failure of police to safeguard her constitutional right through the administration of Miranda warnings before proceeding with Myers' custodial interrogations. Accordingly, we quash the Fifth District's decision below.

# I. BACKGROUND

On June 16, 2008, Gary Kenney, Myers' husband,[3] was found murdered in his family's home in Merritt Island, Florida. He had been shot several times and had several lacerations to his wrist and neck. Shortly after the victim's body was found, Myers' son, Darryl Kenney, and his friend, Rubin Nero, were apprehended near the scene and confessed to the murder. Both Darryl and Rubin implicated Myers in planning and facilitating the murder. As a result, law enforcement officers believed that Myers was an integral part of the conspiracy to murder Gary and brought her to the police station for questioning on June 16, 2008, and June 20, 2008.

The first questioning on June 16, 2008, occurred sometime after 2:00 a.m. At that time, Myers was staying with her in-laws while her home was being processed as a crime scene. Deputy Sheriff Kent of Brevard County ("Agent Kent") testified at the suppression hearing that it was after midnight when he and Brevard County Sheriff's Agent Martin ("Agent Martin") arrived at the in-laws' home.

Upon their arrival to Myers' in-laws' home, Agent Kent explained to Myers that he needed more information from her about her husband's murder, and,

---

3. Sharon Myers (defendant) was known as Sharon Kenney at the time of the murder.

according to him, Myers "volunteered to come down to [the] Merritt Island precinct" for questioning. Agent Kent testified that he advised Myers that she was free to leave before they departed the in-laws' house. Myers rode to the precinct in the front seat of Agent Kent's agency-issued, unmarked vehicle without handcuffs.

Upon arrival at the precinct, Myers was placed in a room, which, due to ongoing building renovations, was not originally designed for questioning and was, therefore, smaller than a typical interview room. Myers was seated in the corner so that she would be seen on the camera inside the room. The door was closed for privacy, but it was not locked. Myers was questioned for approximately ninety minutes about her involvement in the murder. A four-man team consisting of Agents Kent, Martin, Vitaliano, and Reyes took turns questioning Myers. After questioning Myers, Agent Kent returned Myers to her in-laws' home around 4:00 a.m. She again rode in the front passenger seat of his unmarked car without handcuffs.

The next day, investigators executed a search warrant on the hotel room in which Darryl stayed in the days leading up to the murder. During the search, Agent Kent found letters that Darryl received from Myers while incarcerated; Darryl had been released just days before the murder. Agent Kent testified that his review of those letters over the next few days revealed more evidence, which led him to believe that Myers was complicit in Gary's murder. Based on this

information, Agent Kent decided to question Myers further about the contents of the letters.

On June 20, 2008, Agent Kent and another agent arrived at Myers' home during the daytime. Agent Kent explained to Myers that he "needed her to speak with [him] again regarding some new evidence that had come up." He "asked if she would be willing to come down to the [Criminal Investigations Division ("CID")] building in Rockledge." Again, Myers was told she was free to leave before the questioning commenced. And, according to Agent Kent, Myers "again, as the first time, volunteered to do so." Similar to the first time Myers was questioned, Myers rode in the front passenger seat of Agent Kent's agency-issued, unmarked vehicle without handcuffs.

Upon arrival at the CID, Agents Kent and Vitaliano escorted Myers into a standard interview room. Myers was again seated in the corner, although not for any particular reason, according to Agent Kent. The same four-man team from the first interview, plus a fifth agent, Agent Spadafora, questioned Myers for approximately one hour and forty-five minutes. Thereafter, Agent Kent transported Myers home.

After being charged with the murder, Myers filed a motion to suppress the statements she made to police on June 16 and June 20, alleging that her statements were illegally obtained because the interviews constituted custodial interrogations.

After a hearing, during which the lead investigator testified and video recordings of both interviews were played in open court, the trial court granted the motion to suppress. In the trial court's order granting Myers' motion to suppress, the trial court further explained:

> Although [Myers] was told at the start of each interrogation that she was not in custody, a reasonable person would not have felt free to leave. During both interrogations, she was seated in the corner of a small room with law enforcement blocking her access to the door. The door remained closed throughout her interrogations. Officers were seated in close proximity to [Myers], invading her personal space. [Myers] was never offered a break and was given water on only one occasion. [Myers'] daughter was allowed to see [Myers] only briefly, until Agent Kent told her to leave. [Myers] was never reminded during either interrogation that she was not in custody. At the end of the second interrogation, Agent Kent told [Myers] "you've always been free to go," but that alone does not vitiate the need for the Defendant to be advised of her Miranda rights. Further, [Myers] was dependent upon law enforcement for transportation back to her residence.
>        . . . On both occasions, [Myers] was immediately and aggressively confronted by multiple officers about her involvement in the murder. The tone of their questioning indicated that law enforcement believed [Myers] was a suspect. Officers indicated they had information from [Myers'] "conspirators" that she had acquired the weapons used in the murder and that she had arranged for Mr. Kenney to come home at the time of the murder. Agent Kent told [Myers] he had spent hours reviewing the letters [Myers] had written to Darryl and that based on those letters, he knew [she] was involved. He had copies of the letters, and quoted from them to [Myers].
>        . . . Multiple officers questioned [Myers] in a tag-team style designed to elicit information from [her]. One officer used a sympathetic approach to gain [Myers'] trust, another officer accused [Myers] of being "full of unadulterated sh[]t", and another officer graphically described the wounds on the victim's body. Yet another officer posed as a friend, based on prior acquaintance with [Myers],

and then sought incriminating testimony from her. At least five separate officers questioned [Myers] during her two interrogations.

. . . Based upon the totality of the circumstances, the Court finds [Myers] was in custody at the time of her interrogations and because she was not advised of her Miranda rights, her statements to law enforcement must be suppressed. However, the Court also finds that those statements were voluntary and therefore can be used for impeachment purposes at trial. Carlisi v. State, 831 So. 2d 813 (Fla. 4th DCA 2002).

Trial Court Order (emphasis added).

The State appealed, arguing that the trial court erred in granting Myers' motion to suppress because the evidence presented at the suppression hearing established that Myers was not in custody during the interviews. Myers, 169 So. 3d at 1229-30. After reviewing the evidence and the trial court's findings of fact, the Fifth District reversed the trial court, concluding that "a reasonable person in the defendant's position would have felt free to terminate the interviews," after emphasizing that the officers told her that she was free to leave at any time. Id. at 1231.

## II. ANALYSIS

Both the Fifth Amendment to the United States Constitution and article I, section 9, of the Florida Constitution provide a constitutional right against self-incrimination. U.S. Const. amend. V; art. I, § 9, Fla. Const.; see Horwitz, 191 So. 3d at 439. In Miranda, the seminal case on the right against self-incrimination, the United States Supreme Court held that "the prosecution may not use statements,

whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. As we explained in Ross:

> "The requirement of warnings and waiver of rights is a fundamental [sic] with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." [Miranda, 384 U.S.] at 476. The Supreme Court has also recognized that the prophylactic Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." [Oregon v. ]Elstad, 470 U.S. [298,] 305 [(1985)] (quoting New York v. Quarles, 467 U.S. 649, 654 (1984)). As recognized in Elstad, the Miranda exclusionary rule sweeps more broadly than the Fifth Amendment itself: "A Miranda violation does not constitute coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." Id. at 307 n.1 (emphasis omitted). This presumption is irrebuttable for the purposes of the State's case in chief. Id. at 307.
> These protections are equally applicable under the Florida Constitution. As this Court has recognized, "[t]he protections enunciated in Miranda have been part of this State's jurisprudence for over a century pursuant to the Florida Constitution." Ramirez, 739 So. 2d at 573; see also Traylor, 596 So. 2d at 964-66. Traylor[, 596 So. 2d at 964,] explains the contours of our state constitutional law:

> > The basic contours of Florida confession law were defined by this Court long ago under our common law. We recognized the important role that confessions play in the crime-solving process and the great benefit they provide; however, because of the tremendous weight accorded confessions by our courts and the significant potential for compulsion—both psychological and physical—in obtaining such statements, a main focus of Florida confession law has always been on guarding against one thing—coercion. . . . The test thus is one of

- 9 -

voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession. This determination is to be made by the judge, in the absence of the jury, based on a multiplicity of factors, including the nature of the questioning itself.

Ross, 45 So. 3d at 413-14 (footnote omitted).

The Fifth District concluded that Myers was not in custody on either occasion for the purpose of requiring the administration of Miranda warnings, emphasizing that the agents told Myers that she was free to leave prior to both interrogations. Myers, 169 So. 3d at 1231-32. On the other hand, the trial court and Judge Cohen's dissent in the Fifth District highlighted other factors within the Ramirez framework that indicated that Myers was in custody during both interrogations, including the agents' aggressive and accusatorial tone. Id. at 1232 (Cohen, J., dissenting).

We proceed by explaining the federal and Florida constitutional rights against self-incrimination and case law surrounding those rights. We then analyze the totality of the circumstances surrounding Myers' interrogations within this framework. Ultimately, we conclude, consistent with the trial court and Judge Cohen's dissent in the Fifth District, that Myers' constitutional right against self-incrimination under the United States and Florida Constitutions was violated by the failure of police to administer Miranda warnings because her interactions with police on both June 16 and June 20, 2008, were custodial interrogations.

## A. The Federal and State Constitutional Right Against Self-Incrimination

The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Article I, section 9, of the Florida Constitution provides, "No person shall . . . be compelled in any criminal matter to be a witness against oneself." Art. I, § 9, Fla. Const. In Miranda, the United States Supreme Court "required that any individual held for [custodial] interrogation must be clearly informed as to his or her rights, including the 'right to remain silent, that any statement he does make may be used as evidence against him, and . . . [the] right to the presence of an attorney, either retained or appointed.' " Ross, 45 So. 3d at 413 (quoting Miranda, 384 U.S. at 444). Informing persons of their constitutional rights, referred to comprehensively as Miranda warnings, is likewise required under article I, section 9, of the Florida Constitution. See Traylor, 596 So. 2d at 965-66.

Florida's right against self-incrimination is part of the Florida Constitution's Declaration of Rights, "a series of rights so basic that the framers of our Constitution accorded them a place of special privilege," and is, therefore, fundamental. Id. at 963; State v. J.P., 907 So. 2d 1101, 1109 (Fla. 2004) ("It is settled law that each of the personal liberties enumerated in the Declaration of

Rights of the Florida Constitution is a fundamental right."). In Traylor, this Court

emphasized the significance of Florida's fundamental rights, specifically the right

against self-incrimination:

> Special vigilance is required where the fundamental rights of Florida citizens suspected of wrongdoing are concerned, for here society has a strong natural inclination to relinquish incrementally the hard-won and stoutly defended freedoms enumerated in our Declaration in its effort to preserve public order. Each law-abiding member of society is inclined to strike out at crime reflexively by constricting the constitutional rights of all citizens in order to limit those of the suspect—each is inclined to give up a degree of his or her own protection from government intrusion in order to permit greater intrusion into the life of the suspect. The framers of our Constitution, however, deliberately rejected the short-term solution in favor of a fairer, more structured system of criminal justice:
>
>> These rights [enumerated in the Declaration of Rights] curtail and restrain the power of the State. It is more important to preserve them, even though at times a guilty man may go free, than it is to obtain a conviction by ignoring or violating them. The end does not justify the means. Might is not always right. Under our system of constitutional government, the State should not set the example of violating fundamental rights guaranteed by the Constitution to all citizens in order to obtain a conviction.
>
> Bizzell v. State, 71 So. 2d 735, 738 (Fla. 1954). Thus, even here— especially here—where the rights of those suspected of wrongdoing are concerned, the framers drew a bright line and said to government, "Thus far shalt thou come, but no farther."

Traylor, 596 So. 2d at 963-64.

It is also important to reemphasize the purpose of Miranda warnings. As the

United States Supreme Court explained in Miranda:

> [T]he Fifth Amendment privilege is available outside of criminal court proceedings and <u>serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves</u>. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.

<u>Miranda</u>, 384 U.S. at 467 (emphasis added). In other words, the purpose of <u>Miranda</u> warnings is to ensure that the person is aware of his or her constitutional right against self-incrimination. See <u>id.</u> As this Court articulated in <u>Ramirez</u>:

> This constitutional guarantee [against self-incrimination] "is fully applicable during a period of custodial interrogation." <u>Miranda v. Arizona</u>, 384 U.S. 436, 460-61 (1966). Thus, to be admissible in a criminal trial, the State must prove that the confession was not compelled, but was voluntarily made. . . .
> In <u>Miranda</u>, <u>the United States Supreme Court enunciated a bright-line rule to guard against compulsion and the coercive nature and atmosphere of custodial interrogation, and "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process</u>." [<u>Id.</u>] at 469. . . .
> "The requirement of warnings and waiver of rights is . . . fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." [<u>Id.</u>] at 476. . . . Therefore, "unless and until [the <u>Miranda</u>] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]." [<u>Id.</u>] at 479. <u>The protections enunciated in Miranda have been part of this State's jurisprudence for over a century pursuant to the Florida Constitution.</u>

<u>Ramirez</u>, 739 So. 2d at 572-73 (emphasis added) (citations omitted). Essentially, a suspect must be informed of his or her rights via <u>Miranda</u> warnings when subjected

to custodial interrogation by police.  See Miranda, 384 U.S. at 467-68; Ramirez, 739 So. 2d at 572-73.

Recently in Horwitz, we explained that the right "against self-incrimination provided in the Florida Constitution offers more protection than the right provided in the Fifth Amendment to the United States Constitution."  191 So. 3d at 439 (citing Rigterink v. State, 66 So. 3d 866, 888 (Fla. 2011)).  Although this Court has previously construed the procedural safeguards of Miranda in accordance with United States Supreme Court precedent and relied on United States Supreme Court precedent for guidance in determining when custodial interrogation occurs, consistent with federalist principles, this Court has also developed its own framework, as set forth in Ramirez and Ross, to guide police and courts in determining when Miranda warnings are necessary.  As we explained in Traylor:

> [W]hen called upon to construe their bills of rights, state courts should focus primarily on factors that inhere in their own unique state experience, such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, the state's own general history, and finally any external influences that may have shaped state law.

596 So. 2d at 962; accord id. at 965-66; see Florida v. Powell, 559 U.S. 50, 56 (2010) (quoting Minnesota v. Nat'l Tea Co., 309 U.S. 551, 557 (1940)).

Therefore, our analysis under Florida's constitutional right against self-

incrimination provides the basis for our determination of custodial interrogation in this case.

## B.  Defining "Custodial Interrogation"

In State v. McAdams, 193 So. 3d 824 (Fla. 2016), we defined "interrogation" as "when a state agent asks questions or engages in actions that a reasonable person would conclude are intended to lead to an incriminating response." Id. at 833; see Miranda, 384 U.S. at 444 (defining "interrogation" as "questioning initiated by law enforcement officers"). Pursuant to this definition of interrogation, both times that police questioned Myers in this case were interrogations for Miranda purposes. See McAdams, 193 So. 3d at 833. Thus, the specific issue in this case is whether the police interrogations of Myers on June 16 and June 20 were custodial for purposes of requiring the administration of Miranda warnings.

As to determining whether an interrogation is custodial, we explained in Ramirez that "[c]ustody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest." 739 So. 2d at 573. As we stated in Caldwell v. State, 41 So. 3d 188 (Fla. 2010), "[t]he standard for 'custody' is whether, based on the totality of the circumstances, a reasonable person would feel that his freedom of movement has

been restricted to a degree associated with an actual arrest." Id. at 197 (citing Ramirez, 739 So. 2d at 573).

In Ramirez, we adopted a "four-factor test . . . [for determining] whether a reasonable person in the suspect's position would consider himself in custody":

> (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; [and] (4) whether the suspect is informed that he or she is free to leave the place of questioning.

739 So. 2d at 574. This Court explained these factors in Ross:

> [I]t must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police.

45 So. 3d at 415.

Likewise, in McAdams, we reiterated what establishes "custody" for Miranda purposes:

> "Custody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest. A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest. "The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation."
>
> Ramirez, 739 So. 2d at 573. Although we approved in Ramirez a four-factor test to provide courts with guidance in determining

- 16 -

whether an individual in is custody . . . . [C]ourts are to consider the totality of the circumstances in determining whether a reasonable person would believe that his or her freedom of action has been curtailed to a degree associated with actual arrest.

McAdams, 193 So. 3d at 833 (citations omitted) (emphasis added). We further explained in McAdams that no "single specific comment, question, or circumstance . . . converts an encounter from noncustodial to custodial." Id. at 839. Rather, "[a] situation can commence as a voluntary interaction with police, but slowly intensify and become more pressured, pointed, and accusatory until it evolves into custodial status." Id.

Although the four Ramirez factors frame our analysis, "the ultimate inquiry is twofold: (1) the 'circumstances surrounding the interrogation;' and (2) 'given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " Ross, 45 So. 3d at 415 (quoting Yarborough v. Alvorado, 541 U.S. 652, 663 (2004)).

## C. Standard of Review for Determining "Custody"

"Determining whether the defendant was 'in custody' so as to require the administration of Miranda warnings involves a mixed question of law and fact subject to independent review." Ross, 45 So. 3d at 414. In Thompson v. Keohane, 516 U.S. 99 (1995), the United States Supreme Court explained why such independent review is necessary:

- 17 -

> [C]lassifying "in custody" as a determination qualifying for independent review should serve legitimate law enforcement interests as effectively as it serves to ensure protection of the right against self-incrimination. As our decisions bear out, the law declaration aspect of independent review potentially may guide police, unify precedent, and stabilize the law.

Id. at 115. Because determining whether an interrogation was custodial is somewhat fact-dependent, the object of our jurisprudence is not to set forth a bright-line rule but to ensure that in situations when a reasonable person would not feel free to leave, police properly administer Miranda warnings. See id. Although the determination of whether a person is in custody is a mixed question of law and fact, we nevertheless endeavor to provide clear guidance to police as to when Miranda warnings should be given.

This Court has explained:

> [A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.

Globe v. State, 877 So. 2d 663, 668-69 (Fla. 2004) (quoting Nelson v. State, 850 So. 2d 514, 521 (Fla. 2003)). Further:

> Suppression issues are extraordinarily rich in diversity and run the gamut from (1) pure questions of fact, to (2) mixed questions of law and fact, to (3) pure questions of law. . . . Appellate courts cannot use their review powers in such cases as a mechanism for reevaluating

- 18 -

conflicting testimony and exerting covert control over the factual findings. As with all trial court rulings, a suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues, and the proper standard of review depends on the nature of the ruling in each case.

State v. Glatzmayer, 789 So. 2d 297, 301 (Fla. 2001) (footnotes omitted).

Also, as in this case, where a defendant is recorded either by audiotape or videotape, appellate review of the facts is aided in determining whether the trial court's findings are supported by competent, substantial evidence. Id. at 160. Keeping that standard of review in mind, we turn now to review the circumstances surrounding Myers' interrogations within the framework of the Ramirez factors. The trial court also considered the facts of this case in the context of the Ramirez factors before concluding that Myers was, in fact, subjected to custodial interrogation for Miranda purposes.

### D. Application of the Ramirez Factors to This Case

As we stated above, the four factors relevant to the custody inquiry are:

(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; [and] (4) whether the suspect is informed that he or she is free to leave the place of questioning.

Ramirez, 739 So. 2d at 574. This is a conjunctive test, so no factor is solely determinative of whether Myers was in custody for Miranda purposes. See, e.g., Ross, 45 So. 3d at 416.

**1. The Manner in Which Myers Was Summoned For Questioning**

The first factor from <u>Ramirez</u> is "the manner in which police summon the suspect for questioning." 739 So. 2d at 574. Myers' first interrogation took place in the early morning hours after her husband's body was found. Agents Kent and Martin went to Myers' in-laws' house and explained that they "needed to interview her" regarding the ongoing investigation of her husband's murder. Myers agreed to accompany the agents to a local precinct for the interview. According to Agent Kent, prior to leaving her in-laws' house, the agents told Myers that she was free to leave. However, Myers was dependent upon Agent Kent for transportation back to her home. Nevertheless, Myers rode, without handcuffs, to the precinct in the front passenger seat of Agent Kent's unmarked car.

The second interrogation occurred days later. This time, Agent Kent and another agent arrived at Myers' home during the daytime and requested that she come to the CID to speak with them about letters they had found in the hotel room, where her son had stayed in the days leading up to the murder. Again, agents indicated that Myers would be free to leave, and, according to Agent Kent, Myers again went voluntarily. Agent Kent drove Myers without handcuffs in the front passenger seat of his agency-issued, unmarked vehicle.

Although the manner in which Myers was summoned for questioning both times was not particularly coercive or forceful, Agent Kent indicated on both

occasions that he "needed" to question Myers. Neither time was Myers given the option to transport herself to the place of questioning, and Myers only learned of the agents' need to question her when both officers physically arrived to see her. The fact that Myers was not handcuffed is certainly not, in isolation, indicative of the interrogations being noncustodial.

Further, the timing of these interrogations is significant. Myers was first summoned to the police station sometime after 2:00 a.m., just hours after her husband's murder. Prior to the second interrogation, Agent Kent told Myers that the questioning would be related to letters she had written to her son while he was in prison, which would have conveyed to a reasonable person that the purpose of the interrogation was accusatorial, not investigative or neutral. Under these circumstances, a reasonable person in Myers' position would not have felt free to decline the interrogation or leave. Thus, this factor favors a finding that Myers was in custody, and we proceed to review the other factors.

### 2. The Purpose, Place, and Manner of the Interrogation

The second factor we consider is "the purpose, place, and manner of the interrogation," which has always been an important consideration in the custody inquiry. Ramirez, 739 So. 2d at 574. In this case, this factor weighs heavily in favor of a finding that Myers was in custody. As borne out by the evidence, the purpose of these interrogations, especially the second, was not just to gain

information about the circumstances surrounding Myers' husband's murder but also to gain incriminating information about Myers. See McAdams, 193 So. 3d at 833.

From the commencement of the first interrogation, it would be clear to a reasonable person that the interrogations were not being conducted for routine information-gathering purposes. Within seconds of beginning the interrogation, Agent Kent told Myers that her son, Darryl, confessed to killing his father and implicated her in facilitating the murder. Agent Kent told Myers that they could track the phone calls between her and Darryl while Darryl was in prison and on the day of the murder. He told her that all of the letters she sent Darryl in prison were read by corrections officers, and suspicious contents were photographed.[4]

Law enforcement already knew that Myers' son and his friend had confessed and implicated Myers as being involved in orchestrating her husband's murder, and agents made Myers aware of this knowledge. Thus, the interrogation was clearly intended to elicit a confession from Myers to further support the case that agents were building against her. See McAdams, 193 So. 3d at 833. As we stated

---

4. Although Agent Kent testified at the suppression hearing that he did not discover the letters until after the first interrogation, his reference to the letters during the first interrogation indicates that he was at least aware at that time of the existence and incriminating nature of the letters, which further indicates that law enforcement already knew Myers was involved in the murder and considered her a suspect at the time of the first interrogation.

in Ross, "a deliberate attempt to elicit incriminating statements in a coercive manner, undermin[es] the very purpose of Miranda. Miranda itself addressed 'interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice' about speaking . . . ." 45 So. 3d at 427 (quoting Miranda, 384 U.S. at 464-65). Indeed, Agent Vitaliano told Myers that he was "accusing [her] of being a coconspirator to [Gary's] murder." Thus, this factor weighs in favor of finding that the first interview was custodial.

It is even clearer that the purpose of the second interrogation was obtaining a confession. Upon arrival at the CID, Agents Kent and Vitaliano escorted Myers into an interrogation room and began the second interrogation as follows:

> KENT: Okay. So let's—let's—Sharon, let's you and I move along as if we haven't had a conversation, although you and I spoke Monday night at length.
>     I think some of the things that you told us Monday night just isn't true. I think that there's some things that you need to clear up for us. And I am going to give you the opportunity today, right now, to tell the truth.
>     And all of these details, as painful as they're going to be, I need to know why you felt the necessity to plot and plan to have your husband being murdered at your son's hands.
>     Whether your son did it or this hitman that you were trying to hire did it, why did you feel pushed to that level? What did he -- what had Gary done?

(Emphasis added.) Before Myers could even say a word, she was told that officers knew she was lying and she needed to tell the truth to explain why she planned her husband's murder.

- 23 -

As to the place of the interrogations, Myers was seated in the corner of a small room in a sheriff's office, while under video surveillance, with several agents surrounding her during both interrogations —four agents during the first interview and five agents during the second interview. In such small quarters surrounded by authorities, it is likely, as the trial court concluded, that "a reasonable person would not have felt free to leave." Accord Yarborough, 541 U.S. at 663.

Also, the agents sat so close to Myers at times during the second interrogation that their knees touched her. At other times, the agents held Myers' hands. This intimidation, coupled with intermittent sympathy and physical contact by the agents, further supports the conclusion that a reasonable person would not have felt free to leave—for fear of either emotional retaliation or physical restraint by the agents, who had not shown any boundaries.

Turning to the manner of the interrogations, the second interrogation was extremely accusatorial. In the words of the interrogators:

> KENT: You and Darryl Kenn[e]y conspired, planned, you gave financial support. You facilitated vehicle support. You put him up in a place. You told him where to get the gun. You helped your son kill Gary Kenn[e]y.
> Why did you do it? What drives a mother to write letters like that to her son? What drives a woman to try to get phone numbers of hitmen to kill her husband? . . . It's all in black and white right here, Sharon (indicating). You can't deny it. You can't say it didn't happen.
> What you're saying about: Well, I never wanted that to happen. I didn't plan for that, is lies. You are lying when you say that because

you did plan for it.  You did prepare for it.  You wrote it down.  That's where you f[*****] up.

It went from thought to action, and you detail it all out in these letter.

Sharon, this is the time for you to tell us why it happened. Okay, this is the time to tell us, right here and right now.  You wanted him dead didn't you?

MYERS:  I really don't.

KENT:  You wanted him dead, didn't you?

MYERS:  I really don't.

KENT:  Time and time again, Sharon, you said you wanted him dead. You wanted him to disappear.  You thought about pushing him over the edge at the gator farm.  You thought about poisoning his potatoes. You wish he would have a wreck and die on his way to work.  You wished the door would've fell on him and crushed his bones.

Ain't that what you wanted, you wanted him dead?  You wanted him dead for a reason, what's the reason?  You obviously wanted him dead for a reason.  You helped plan to get him murdered. You tried to help your son get away with the murder.  You told your son to go move the body out of the house. . . .

Don't get it twisted.  We've got eye witnesses.  There's neighbors and friends of yours that were coming out of the movie theater that seen you in the mall parking lot talking to your son and Rubin Nero after Gary was dead.  You can't hide no more, Sharon. You're not getting away with it.  You might have thought you were. You might have thought you were scot-free, but you're not.

The only option you have left, the only option you have left is to help yourself and tell me why you wanted Gary Kenn[e]y dead.

MYERS:  I didn't really want him dead.

KENT:  Do you want me to read the letters again?

MYERS:  No.

KENT:  You wanted him dead.

MYERS:  I wanted him to go away.

- 25 -

KENT:  Forever?

MYERS:  No.

KENT:  You wrote that.  Do you want me to read it?

MYERS:  No, it's not --

KENT:  You wanted him dead, why can't you admit it?  Don't be scared now.  When you were having these evil thoughts, you were strong enough to write them.

 . . . .

MYERS:  I didn't really want him dead.

KENT:  <u>Well, you shouldn't have conspired with your son to kill him.</u>  When your son came to you when he got out of prison, and laid out his plan to you.

MYERS:  I didn't know he was going to kill him.

KENT:  Bulls--t.  Don't forget, Sharon, Darryl is talking.  <u>He don't want to get the needle in his arm.</u>

VITALIANO:  You know, when a person is backed into a corner they are willing to tell all.  Okay?  And when a person is facing their life, they are going to talk to us.  It don't matter if it's mom, dad, brother, sister, all of that is out the window.  It's out the door.  Okay?
        And that's why we are here talking to you right now.  All right, this is your opportunity.  Not a lot of people get opportunities like this, this is to help your side of the story.  All right, this is it.  This is the time.  This is where you need to start telling the truth.  Because all of this other stuff that you have been talking about is not the truth.
        It's not going to cut it.  Okay?  You tell me, you put, you know, six people, five people, and you read these letters and we present this evidence, what do you think a person is going to think?  Put yourself in our shoes, what would you think?

(Emphasis added.)

- 26 -

Further, officers threatened Myers that if she did not confess, she would not be able to raise her youngest child, her teenage daughter would be charged with accessory to murder, and her oldest son could "get the needle in his arm." Agent Reyes told Myers that her son, Darryl, would never get out of prison, get married, have children, grow old, or "enjoy the joys of life" if she did not take responsibility for the murder. He told her that by not taking responsibility for the murder she was going to let Darryl "rot" in prison and be "portrayed like a monster." Specifically, Agent Reyes said:

> [Darryl] is your martyr, your own flesh and blood. Your son you gave birth to, the son you raised and you loved, turns out to be your martyr. He gave up his life to kill your husband so you could be happy. . . .
>  . . . .
> You weren't responsible when you poisoned your son to do this act. Be responsible now and maybe people could say: You know what, maybe Darryl—maybe Darryl was manipulated in a certain way. He definitely was vulnerable. And his mama is the one that helped him get to that point.
> Rather you don't want to own up to what really happened and Darryl is taking the whole brunt of this. He is your martyr. He [is] going to give the rest of his life for your cause. And you did nothing to stop it, Sharon. I'm sorry, but you did nothing to stop it.
> Here's your chance to show your love for Darryl and to speak and tell us the truth of what really happened; to show the world . . .

(Emphasis added.)

In Pennsylvania v. Muniz, 496 U.S. 582 (1990), the United States Supreme Court explained:

- 27 -

> "[A]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining" what the police reasonably should have known. [Rhode Island v.] Innis, 446 U.S. [291], 302, n. 8 [(1980)]. Thus, custodial interrogation for purposes of Miranda includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have . . . the force of a question on the accused," Harryman v. Estelle, 616 F.2d 870, 874 [(5th Cir. 1980)], and therefore be reasonably likely to elicit an incriminating response.

Muniz, 496 U.S. at 601. Indeed, while interrogating Myers, the agents knew, especially due to the letters they read, that Myers had a "special susceptibility" to coercion under pressure regarding her children, which would be "reasonably likely to elicit an incriminating response" in order to save her son from the officers' threats and have the opportunity to raise her other children. Id. Thus, the agents' statements regarding Myers' son further indicate coercion.

Further, the place and manner of these interrogations would be especially intimidating to a reasonable person. In considering this factor in Ross, we wrote:

> However, at the point when Detective Waldron informed Ross about the bloody pants, the detective's focus shifted from merely questioning a witness to attempting to obtain a confession and pressuring Ross to admit his involvement in the crime. The detective repeatedly told Ross that he knew Ross committed the crime and the only question remaining was why. This type of questioning, which was highly confrontational and accusatorial, lasted for hours and took place in a very small room at the station with at least two officers in the room. Moreover, at this point, when Ross asked for a smoke break, the detective told him to smoke in the room, while the questioning continued. This factor clearly supports a conclusion that the defendant was in custody.

45 So. 3d at 415-16 (emphasis added).

Similar to Ross, in this case, both times Myers was questioned four or five officers alternated in questioning her for between ninety minutes and two hours, often employing a good-cop/bad-cop strategy or, as the trial court characterized it, a "tag-team style designed to elicit information." Both times, the officers intermittently raised their voices, cursed at Myers, called her a liar, and told her that they could prove she was guilty so she had no choice but to confess. Specifically, Agent Kent yelled at, belittled, and mocked Myers, as he aggressively and continuously repeated, "You wanted him dead, didn't you?"

Agent Vitaliano told Myers that if she confessed, he would talk to his boss, the State Attorney's Office, and "everybody" and tell them that he believed that she was a battered woman who felt she had no choice. Agent Spadafora—who was not otherwise involved in the investigation—was sent into the interrogation room to pose as a friend and "familiar face" to Myers, but he also attempted to extract a confession from Myers.

In conclusion, the purpose, place, and manner of both Myers' interrogations was similar to the aggressive and accusatory manner of the interrogation in Ross, which this Court determined was custodial for purposes of Miranda. See Ross, 45 So. 3d at 415-16. The agents were clearly searching for a confession, rather than merely gathering information. They repeatedly told Myers that they knew she

- 29 -

directed her son to murder her husband, and the only remaining question was why. She was questioned for hours in small rooms by multiple agents in a confrontational and accusatorial manner. And, although Myers was told she was free to leave before reaching the place of questioning, she was also told to "stay right here" and relied on the officers for transportation. As in Ross, this factor strongly supports a conclusion that Myers was in custody during the interrogations and that Miranda warnings should have been administered. See id.

### 3. The Extent to Which Myers Was Confronted With Evidence of Her Guilt

The third factor is "the extent to which the suspect is confronted with evidence of his or her guilt." Ramirez, 739 So. 2d at 574. In this case, this factor is intertwined with the second factor. Myers was extensively confronted with evidence of her guilt throughout both interrogations. As described above, the first interrogation began with Agent Kent telling Myers (1) that Darryl confessed and implicated her in facilitating the murder, (2) that her phone calls with Darryl were tracked and recorded, and (3) that letters she wrote to Darryl in prison had been photographed. She was told that both Darryl and Rubin informed the agents that Myers instructed Darryl to remove her husband's body from the house after the murder.

Like the first interrogation, the second interrogation began with officers confronting Myers with strong evidence of her guilt. She was immediately told

- 30 -

that the police had evidence to prove that she intended for Darryl to kill her husband. Agent Kent then read excerpts from some of the many, extremely incriminating letters found in Darryl's hotel room, which Myers acknowledged she had written. In the letters, Myers wrote about devising a plan with Darryl to kill Gary. She discussed "feelings of homicide" as well as providing Darryl with a gun, a truck, and money to facilitate the murder, or hiring a hitman, whom she planned to pay with Gary's motorcycle. In her letters, Myers also provided Darryl with information about the victim's daily routine, including the time he would leave for work in the morning and that he would often step outside alone in the middle of the night. She wrote to Darryl that she hated her husband, wished he would die in an accident, and that she kept hoping to get a phone call saying that he was dead. She repeatedly discussed her or Darryl getting her "problem to go away" and "get[ting] the job done" without her "get[ting] into any trouble" or him "spend[ing] anymore time in jail." Agent Kent also read Myers a letter written to her by Darryl, which the agents found in Myers' home:

> Mom, we will play dirty. We need to get Amanda to play along if she really wants Gary gone. You, under no circumstances, are to do anything to Gary just (indiscernible). I am going to feed the gators when I get out. Let me handle the situation when I get out. Because if he so much as touches any[one] again, I will torture him. Make sure you have the keys and $500 ready for me when I get out. Okay? When I get out, we will go through everything, the works. Does Nana still have all the guns? Gary will pull a disappearing act in 86 days. I am going to show him. PS, Let me handle Gary. Get it all planned out. Keep the motorcycle for me. Let me do this. Don't worry.

Myers was also told that agents had information that she recently asked her husband to renew his life insurance policy. At one point, one of the agents described the evidence against Myers as a "mountain of evidence" to "which any reasonable person would say: 'Oh my God.'"

Myers was also told that her daughter had given a sworn statement indicating that she and Myers were both aware of Darryl's plan to murder Myers' husband. Agents also told Myers that her daughter had been "running her mouth" about the murder plot. Agent Kent said that even though Myers was not present at the time of the murder and did not pull the trigger, he knew that she facilitated the murder, helped Darryl get the gun that he used in the murder, provided him with transportation, and helped him try to cover up the murder.

Myers was confronted with very strong, indisputable evidence of her guilt, including the letters, phone records, and statements of coconspirators and witnesses. Many of the letters were read aloud to her during the interrogation, and boxes filled with even more letters were brought into the interrogation room for her to see. She was repeatedly told that the police could prove that she was behind her son killing her husband. She was told that a jury would find her guilty in ten minutes. Thus, similar to our conclusion in <u>Ross</u>, this factor weighs in favor of finding that Myers was in custody for <u>Miranda</u> purposes.

### 4. Whether Myers Was Told That She Was Free to Leave the Place of Questioning

The final <u>Ramirez</u> factor for considering whether a defendant was in custody is "whether the suspect is informed that he or she is free to leave the place of questioning." 739 So. 2d at 574. The Fifth District improperly emphasized this factor in concluding that Myers was not in custody. <u>See</u> <u>Myers</u>, 169 So. 3d at 1229-30.

Contrary to the emphasis the Fifth District placed on this factor, police merely stating that a suspect is free to leave or terminate the interrogation does not automatically render the interrogation noncustodial. <u>U.S. v. Craighead</u>, 539 F.3d 1073, 1088 (9th Cir. 2008) ("[T]he delivery of these statements [must be considered] within the context of the scene as a whole." (citing <u>United States v. Lee</u>, 699 F.2d 466, 467-68 (9th Cir. 1982) (holding that interrogation was custodial even though suspect was told that he was free to leave or terminate the interview at any time where questioning lasted over an hour in closed FBI car while investigators searched house)); <u>McIntosh v. State</u>, 829 N.E.2d 531, 538 (Ind. Ct. App. 2005). Ultimately, "[t]he <u>Miranda</u> test for custody does not ask whether the suspect was <u>told</u> that he was free to leave; the test asks whether 'a reasonable person [would] have <u>felt</u> he or she was not at liberty to terminate the interrogation and leave.' " <u>Craighead</u>, 539 F.3d at 1088 (quoting <u>Thompson</u>, 516 U.S. at 112).

In this case, Agent Kent testified that when he and Agent Martin went to Myers' in-laws' home to pick Myers up for the first interrogation on June 16, 2008, he told Myers that she was free to leave while they were still at the in-laws' house. And Myers was not told again that she was free to leave until the interrogation at the Merritt Island Precinct had concluded. Therefore, the officers' statement at her in-laws' house could have been understood to mean that she had an option whether to go with the agents to the precinct. Thus, the record does not support the Fifth District's conclusion that Myers was told she was free to leave the place of questioning—the Merritt Island Precinct.

As to the second time police questioned Myers, the video reveals that once Myers was seated in the interrogation room and before questioning began, Agent Vitaliano informed Myers that she was free to leave at any time and asked her if she understood. Myers nodded to indicate her understanding. However, immediately after she nodded, Agent Kent told Myers that he thought she lied during the first interrogation and that he needed her to tell him why she planned her husband's murder.

The police statement that Myers was free to leave during the second interrogation must not be viewed in isolation but, rather, in context of the entire set of circumstances. See, e.g., Ross, 45 So. 3d at 415. After being told she was free to leave at any time before questioning, Myers was immediately confronted with

and accused of her guilt by police upon the start of the interrogation. Agents told Myers that they did not believe the statements she made previously and that they knew she was guilty of planning Gary's murder. She was then confronted with extensive evidence of her guilt, including statements of coconspirators and letters between her and her son, in which they discussed plans of the murder. The fact Myers was free to leave was never repeated after the nearly two-hour interrogation began. Cf. Monroe v. State, 148 So. 3d 850, 857 (Fla. 1st DCA 2014) (finding that the defendant was not in custody for Miranda purposes where, among other reasons, "[i]n stark contrast [to Ramirez]," the defendant was "repeatedly informed . . . that he was free not to talk and to get up and leave the room anytime").

Moreover, even if Myers had wanted to leave, she was dependent upon officers for transportation to and from both interrogations. In other words, police were in control of Myers the entire time after she agreed to be questioned. Thus, this factor also weighs in favor of finding that Myers was in custody for purposes of Miranda.

### E. The Totality of the Circumstances

Under a Ramirez analysis, no single prong should be considered in isolation. See, e.g., Ross, 45 So. 3d at 415. However, the Fifth District improperly elevated the fact that police advised Myers, before she agreed to be questioned, that she was free to leave, to determine that the interrogations were noncustodial. See Myers,

169 So. 3d at 1231. This conclusion ignores that every other aspect of both interrogations would have led reasonable persons to believe they were not free to leave and, therefore, directs a conclusion that Myers was in custody during both interrogations.

Moreover, although the Fifth District acknowledged that prongs two and three favored the defendant, it improperly weighed these against factors one and four by failing to give the appropriate emphasis to the evidence regarding the interrogation, including placement in a small room, confronting Myers with "a mountain of evidence," accusations that she was lying, and use of the good-cop/bad-cop technique. Absent the agents' one statement on each occasion that Myers was free to leave, every other fact surrounding the interviews indicated police coercion and custody. Thus, the Fifth District placed undue weight on the fourth factor at the expense of factors two and three, which is evidenced by its footnote explaining that the defendant did not cite any case where a defendant was found to be in custody where they were told they were free to leave at any time. Id. at 1231 n.3. We therefore conclude that both interviews were custodial and Myers was entitled to Miranda warnings prior to the commencement of each interview.

In reviewing the totality of the circumstances, it is clear that the purpose of the confrontational and accusatory interrogations in this case was to solicit a

confession from Myers. After Darryl and Rubin implicated Myers in her husband's murder, she was not only considered a suspect, but was treated by police during the interrogations in a manner that would lead Myers—or any reasonable person—to conclude that she was suspected in her husband's murder and, therefore, compelled to answer the agents' questions and not free to leave the place of questioning. We emphasize the words of Judge Cohen's dissent as to how the agents obstructed the purpose of <u>Miranda</u> in this case by failing to give Myers <u>Miranda</u> warnings:

> The requirement of <u>Miranda</u> warnings is ingrained in the constitutional analysis of the voluntariness of confessions. . . . As the trial judge recognized, courts should view attempts by law enforcement to circumvent these safeguards warily. We should do the same.

<u>Id.</u> at 1232 (Cohen, J., dissenting).

Reviewing a mixed question of law and fact governed by the totality of the circumstances, the Fifth District failed to defer to the trial court's factual findings and to properly consider "the purpose, place and manner of interrogation" and the "the extent to which the suspect is confronted with evidence of guilt," as set forth in <u>Ramirez</u> and <u>Ross</u>. By concluding that a reasonable person in Myers' situation would have felt free to terminate the interrogations, the Fifth District placed undue weight on the fact that Myers was told she was free to leave before being taken to the place of questioning. After considering the totality of the circumstances

surrounding the questioning of Myers on June 16 and June 20, 2008, we conclude that a reasonable person in Myers' position would have felt constrained, would have felt compelled to answer the officers' accusatory questions, and would not have felt free to terminate the questioning or leave the place of questioning on either occasion.

### III.  CONCLUSION

In attempting to provide guidance to law enforcement as to when to administer Miranda warnings, we emphasize that no single Ramirez factor determines whether a defendant is in custody.  However, when the interrogation is predominately accusatorial and confrontational in nature, taking place in the confines of a police interrogation room so as to lead a reasonable person to believe that he or she is suspected of a crime, all Ramirez factors are likely implicated.  As the trial court explained in this case, the questioning of Myers clearly would have led her to believe she was a suspect in her husband's murder and was not free to terminate the interrogation:

> Although [Myers] was told at the start of each interrogation that she was not in custody, a reasonable person would not have felt free to leave.  During both interrogations, she was seated in the corner of a small room with law enforcement blocking her access to the door.  The door remained closed throughout her interrogations.  Officers were seated in close proximity to [Myers], invading her personal space.  [Myers] was never offered a break and was given water on only one occasion.  [Myers'] daughter was allowed to see [Myers] only briefly, until Agent Kent told her to leave.  [Myers] was never reminded during either interrogation that she was not in custody.  At

the end of the second interrogation, Agent Kent told [Myers] "you've always been free to go," but that alone does not vitiate the need for the Defendant to be advised of her <u>Miranda</u> rights. Further, [Myers] was dependent upon law enforcement for transportation back to her residence.

. . . On both occasions, [Myers] was immediately and aggressively confronted by multiple officers about her involvement in the murder. The tone of their questioning indicated that law enforcement believed [Myers] was a suspect. Officers indicated they had information from [Myers'] "conspirators" that she had acquired the weapons used in the murder and that she had arranged for Mr. Kenney to come home at the time of the murder. Agent Kent told [Myers] he had spent hours reviewing the letters [Myers] had written to Darryl and that based on those letters, he knew [she] was involved. He had copies of the letters, and quoted from them to [Myers].

. . . Multiple officers questioned [Myers] in a tag-team style designed to elicit information from [her]. One officer used a sympathetic approach to gain [Myers'] trust, another officer accused [Myers] of being "full of unadulterated sh[]t", and another officer graphically described the wounds on the victim's body. Yet another officer posed as a friend, based on prior acquaintance with [Myers], and then sought incriminating testimony from her. At least five separate officers questioned [Myers] during her two interrogations.

. . . Based upon the totality of the circumstances, the Court finds [Myers] was in custody at the time of her interrogations and because she was not advised of her <u>Miranda</u> rights, her statements to law enforcement must be suppressed.

All four factors of the <u>Ramirez</u> test compel the conclusion that the totality of the circumstances created a situation in which a reasonable person would not have felt free to leave. Therefore, we conclude that Myers was in custody for <u>Miranda</u> purposes, and because Myers was not provided <u>Miranda</u> warnings prior to the questioning on those dates, the statements she made during those interrogations were obtained in violation of <u>Miranda</u> and must be suppressed from the State's

case-in-chief at trial. Accordingly, we quash the Fifth District's decision and remand for further proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and LEWIS, and QUINCE, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I conclude that there is no express and direct conflict of decisions underpinning our review, I would dismiss this case for lack of jurisdiction under article V, section 3(b)(3) of the Florida Constitution. Contrary to the view adopted by the majority, the Fifth District's decision in State v. Myers, 169 So. 3d 1227 (Fla. 5th DCA 2015), does not expressly and directly conflict with Ross v. State, 45 So. 3d 403 (Fla. 2010), or Ramirez v. State, 739 So. 2d 568 (Fla. 1999).

The majority's view is that Myers conflicts with Ross and Ramirez because "[u]nder a Ramirez analysis, no single prong should be considered in isolation," but "the Fifth District placed undue weight on the [free-to-leave] factor at the expense of factors two and three, which is evidenced by" footnote three of the opinion below. See majority op. at 35-36. But the Fifth District did not consider the fact that Myers was told she was free to leave either in isolation or at the

- 40 -

expense of the other <u>Ramirez</u> factors.  Rather, the Fifth District expressly analyzed

each of the four factors as follows:

> Thus, <u>as for prongs one and four</u>, the manner in which law enforcement summoned the defendant for questioning did not suggest that she was in custody, and the defendant was told, prior to both interviews, that she was not under arrest and she was free to leave at any time.[N.3]
>
> > [N.3]  Notably, the defendant has not cited to any case where a defendant was found to be in custody where the defendant was told, prior to being interviewed, that he/she was free to leave at any time.
> >
> > <u>As for prongs two and three</u>, although one purpose of the interview was to get the defendant to tell the officers her motive for participating in her husband's murder, and the officers spent most of the time during both interviews confronting the defendant with evidence they said they had against her, under the totality of the circumstances, a reasonable person in the defendant's position would have felt free to terminate the interviews.

<u>Myers</u>, 169 So. 3d at 1231 (emphasis added).

When determining whether a defendant is in custody during questioning, a

court properly considers whether the police informed the defendant that he or she

was free to leave the place of questioning, <u>Ramirez</u>, 739 So. 2d at 574, and the

district court's mention in a footnote that Myers failed to cite any case in which a

defendant was determined to have been in custody during questioning despite

being told that he or she was free to leave does not provide any indication, let alone

express indication, that the court misapplied <u>Ross</u> or <u>Ramirez</u> by placing "undue

weight" on the free-to-leave factor "at the expense of factors two and three."  In

- 41 -

considering each of the four <u>Ramirez</u> factors, the Fifth District employed the legal standard our precedents have set forth.  Even if we disagree with the result reached by the district court, "this Court is without power to simply assume jurisdiction in a case to correct what we perceive as error."  <u>State v. Barnum</u>, 921 So. 2d 513, 523 (Fla. 2005); <u>see also</u> <u>Am. Wall Sys., Inc. v. Madison Intern. Group, Inc.</u>, 944 So. 2d 172, 176 (Fla. 2006) (Cantero, J., dissenting) ("Like it or not, we must permit some district court decisions to become final even though we disagree with them.").

The majority also asserts that the Fifth District misapplied our precedents by failing to properly weigh the <u>Ramirez</u> factors and "give the appropriate emphasis to the evidence regarding the interrogation, including placement in a small room, confronting Myers with 'a mountain of evidence,' accusations that she was lying, and use of the good-cop/bad-cop technique," majority op. at 36, but neither <u>Ross</u> nor <u>Ramirez</u> establishes a precedent regarding the "appropriate emphasis" to be given to such case-specific facts.  And the majority's disagreement with how the district court weighed the <u>Ramirez</u> factors does not establish express and direct conflict.  <u>Cf.</u> <u>Cortez v. Palace Resorts, Inc.</u>, 123 So. 3d 1085, 1098 (Fla. 2013) (Canady, J., dissenting) ("But the fact that a majority of this Court disagrees with how a lower court has weighed the <u>Kinney[ System, Inc. v. Continental Insurance</u>

Co., 674 So. 2d 86 (Fla. 1996),] factors does not establish express and direct conflict.").

I therefore conclude that this Court is without jurisdiction to review the Fifth District's decision based on express and direct conflict. Accordingly, I dissent.

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Fifth District - Case No. 5D14-3037

(Brevard County)

Kevin John Mawn of Onek and Mawn, P.A., Titusville, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Wesley Harold Heidt, Bureau Chief, and Kristen Lynn Davenport, Assistant Attorney General, Daytona Beach, Florida,

for Respondent